# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ANTHONY CURTIS, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **No. 12 C 8964** |
| | ) | |
| CAROLYN W. COLVIN,[1] | ) | **Magistrate Judge Finnegan** |
| Commissioner of Social Security, | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Anthony Curtis seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. 42 U.S.C. §§ 416(i), 423(d). The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and filed cross-motions for summary judgment. After careful review of the record, the Court now grants the Commissioner's motion, denies Plaintiff's motion, and affirms the decision to deny disability benefits.

## PROCEDURAL HISTORY

Plaintiff applied for DIB on January 22, 2010, alleging that he became disabled on November 26, 2004 due to arthritis in his lower back. (R. 123, 152). The Social Security Administration denied the applications initially on April 12,

_____

[1] Ms. Colvin became Acting Commissioner of Social Security on February 14, 2013, and is substituted in as Defendant pursuant to Federal Rule of Civil Procedure 25(d)(1).

2010, and again upon reconsideration on July 15, 2010. (R. 57-63, 67-70). Plaintiff filed a timely request for hearing and appeared before Administrative Law Judge Karen Sayon (the "ALJ") on June 21, 2011. (R. 36). The ALJ heard testimony from Plaintiff, who was represented by counsel, as well as from vocational expert Clifford M. Brady. Shortly thereafter, on July 11, 2011, the ALJ found that Plaintiff is not disabled because none of his impairments, alone or in combination, significantly limited his ability to do basic work activities prior to his December 31, 2009 date last insured. (R. 24-30). The Appeals Council denied Plaintiff's request for review on October 12, 2012, (R. 1-3), and Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner.

In support of his request for remand, Plaintiff argues that the ALJ: (1) erred in finding that he does not have any severe impairments; (2) made a flawed credibility determination; (3) improperly characterized the consulting opinion evidence; and (4) failed to consider the effects of his obesity in assessing the severity of his impairments. As discussed below, the Court finds that the ALJ's decision is supported by substantial evidence and does not require reversal or remand.

## **FACTUAL BACKGROUND**

Plaintiff was born on June 2, 1956, and was 55 years old at the time of the ALJ's decision. (R. 123). He completed two years of college and worked for 30 years as a group leader at a steel container manufacturing company before retiring on November 26, 2004. (R. 39-41, 153-54).

## A.    Medical History

The first treatment note in the record is from January 29, 2008, when Plaintiff went to his family physician, Peter Neale, D.O., complaining of low back pain for the previous year, as well as nasal problems.  He told Dr. Neale that the back pain got worse if he sat too long, including in a car, and it hurt to get out of bed in the morning.  Plaintiff said these symptoms had been occurring "for years now" but it was "just getting worse."  (R. 225).  On examination, Dr. Neale noted tenderness in Plaintiff's back at the LS level and prescribed Mobic for pain.  He also diagnosed rhinitis and hypertension.  (R. 224).  X-rays of the lumbar spine taken the same day showed "prominent discogenic osteophytes at L3-L4," and "[m]oderate facet degenerative change" at L5-S1 bilaterally.  (R. 228).

Plaintiff returned to Dr. Neale for a follow-up visit on February 11, 2008, and reported that he was getting "some relief" from the Mobic.  Dr. Neale diagnosed moderate degenerative joint disease and instructed Plaintiff to continue taking the prescribed medication.  (R. 226).  Plaintiff did not seek further treatment until September 17, 2008, when he told Dr. Neale that he had fallen off a ladder while changing light bulbs a month prior and injured his rib cage.  Dr. Neale diagnosed rib cage pain and "low back pain (chronic)."  (R. 223). Approximately 10 months later, on July 20, 2009, Plaintiff saw Dr. Neale again for medication refills.  (R. 216).  His next appointment on September 21, 2009 focused entirely on nasal congestion.  (R. 217).  Four months later, on January 22, 2010, Plaintiff applied for disability benefits dating back to November 2004.

On April 8, 2010, Reynaldo Gotanco, M.D., evaluated Plaintiff's application for the Bureau of Disability Determination Services. Based on the records from Dr. Neale, Dr. Gotanco found that the information was "insufficient to address [Plaintiff's] condition prior to DLI [date last insured] of 12/31/2009." (R. 236). Plaintiff saw Dr. Neale again on July 3, 2010, still complaining of back pain and nasal problems. Dr. Neale diagnosed chronic arthritis in the back and instructed Plaintiff to take Mobic and/or Relafen for the pain. (R. 243). Shortly thereafter, on July 9, 2010, Calixto Aquino, M.D., affirmed Dr. Gotanco's assessment that there is insufficient evidence to evaluate Plaintiff's condition before the DLI. Dr. Aquino noted that Plaintiff did not allege any changes in his condition, or new illnesses or limitations to support his claim. (R. 247)

Eight months later, on March 21, 2011, Plaintiff started seeing Suneela Harsoor, M.D., for back pain management. (R. 263-65). He claimed to have been symptomatic for more than 10 years and described the pain as constant, throbbing, shooting, aching, and radiating to his legs. The pain reportedly worsened with prolonged walking, standing, sitting, activity, and stair use, but Plaintiff conceded that he had received "no treatment" for his condition aside from medication, and was able to perform "all activities of daily living." (R. 263). On examination, Dr. Harsoor found Plaintiff to have bilateral pain with palpation at L3-S1 and at the lumbar intervertebral spaces; his anterior flexion was reduced with pain; and he exhibited palpable trigger points in the lower back. At the same time, his gait was normal, he could do heel and toe walk, he had full strength, and his reflexes and neurological tests were all normal. (R. 264). Dr.

Harsoor ordered an MRI of Plaintiff's lumbar spine and instructed him to supplement the Relafen with Tramadol for pain control. She also encouraged him to start exercising, noting that he was dependent on his mother to perform his daily chores. (R. 265).

Plaintiff's March 24, 2011 MRI revealed hypertrophic spurring at multiple levels representing spondylosis; subligamentous posterior disk herniations at L4-L5 and L5-S1; and mild bilateral neuroforaminal narrowing at L4-L5, which appeared to be exacerbated by mild ligamentum flavum hypertrophy and early facet arthrosis. (R. 262). When Plaintiff returned to Dr. Harsoor on April 11, 2011, his condition was largely unchanged. (R. 259-60). He refused to undergo fluoroscopic guidance at that time, stating that he "cannot afford" it, but he agreed to try a lumbar epidural steroid injection. Dr. Harsoor told Plaintiff to continue taking Tramadol and added Neurontin to his medication regimen. (R. 260).

Dr. Harsoor administered the epidural injection on April 18, 2011. (R. 254). She also completed a Chronic Pain Residual Functional Capacity Questionnaire for Plaintiff the same day. (R. 249-52). Dr. Harsoor stated that she had been treating Plaintiff once or twice a month for two months, and diagnosed lumbar spine pain, lumbar disc protrusion and myofacial pain. She indicated that Plaintiff exhibited tingling, numbness, weakness and muscle spasm, with shooting and throbbing pain radiating to his legs at a level of 9 out of 10. She also reported reduced range of motion in the spine, as well as tenderness and trigger points. (R. 249). Dr. Harsoor opined that Plaintiff

requires a low stress job where he is not required to sit for more than 30 minutes at a time, or stand and walk for more than 15 minutes at a time.  (R. 250).  He can sit, stand and walk for a total of less than 2 hours a day; he must get up and walk for 15 minutes every 10 minutes or so; he needs to be able to shift at will from sitting to standing to walking; he cannot walk more than 6 city blocks; and he needs unscheduled breaks once or twice every 4 hours.  (R. 250-51).  Dr. Harsoor stated that Plaintiff can frequently lift 10 pounds; occasionally lift 20 pounds; never lift 50 pounds; rarely twist, crouch, and climb ladders and stairs; and occasionally stoop.  She also estimated that his condition would cause him to be absent from work about 2 days per month.  (R. 252).

**B.    Plaintiff's Testimony**

On March 15, 2010, Plaintiff completed a Function Report in connection with his application for disability benefits.  (R. 160-67).  He stated that on a typical day he gets up, takes his medicine, microwaves some breakfast, brews coffee, and sits and relaxes reading the newspaper until the medicine "kick[s] in." He then does "any work around the house that I can until I get more pain [and] then I stop."  (R. 160).  Plaintiff said that he sometimes has to sleep in a recliner due to pain, and he also installed "taller toilets."  (R. 161).

With respect to daily activities, Plaintiff spends 3 to 5 minutes making his meals, such as salads, frozen dinners and sandwiches, and when he is not in pain he takes out the garbage and cleans the house, though the cleaning takes him "just about all day."  (R. 162).  He buys clothing and household goods online; goes outside 2 or 3 times a week when he is not in pain; is still able to drive a

car; and enjoys friendly conversation with others 2 or 3 times a week, consisting of visiting his parents, going to the doctor or sometimes eating at a restaurant. (R. 163-64). Plaintiff indicated that he can only walk 1 or 2 blocks before needing to rest for 15 to 20 minutes, and has trouble lifting, squatting, bending, standing, reaching, walking, sitting, kneeling and stair climbing. (R. 165).

At the June 21, 2011 hearing before the ALJ, Plaintiff testified that he retired from his position at the steel container manufacturing company in November 2004 because he had worked a sufficient number of years and "[t]he pains got too bad for me." (R. 40-41). At the time, he was having to take breaks every half hour and was missing 5 days of work per month. (R. 48-49). Plaintiff claimed to have seen a doctor for his condition shortly after he retired in late 2004 or early 2005 and received a prescription for pain medication, but there are no medical records reflecting any such treatment. (R. 43-44). When the ALJ asked Plaintiff why he did not seek medical care until 2008, he explained that he only goes to doctors if "there's . . . something wrong with me," (R. 41), and he thought "this was something . . . that would just blow over" and he "could handle [it] myself." (R. 47). At the same time, Plaintiff said that his pain has been at a level of 8 or 9 out of 10 since 2004. (R. 42-43).

Plaintiff testified that he has trouble lifting and carrying things, noting that he "dropped a gallon of milk" in 2009. (R. 44). On a typical day, he has a bowl of cereal, walks around in his yard, washes out a glass, and tries to spread a sheet over his bed. He can get a few things at a store a block away, but his mother comes over to cook and clean for him almost every day. (R. 46).

**C.     Administrative Law Judge's Decision**

The ALJ found that Plaintiff suffers from lumbar degenerative disc disease, rhinitis and obesity, but that none of these impairments or combination of impairments was severe as of the December 31, 2009 date last insured.  (R. 26-27).   In reaching this conclusion, the ALJ gave significant weight to the opinions of Dr. Gotanco and Dr. Aquino that "there is insufficient evidence to support arthritis of the lower lumbar spine prior to the date last insured," (R. 29), and gave no weight Dr. Harsoor's opinion that Plaintiff is limited to performing less than sedentary work.  The ALJ explained that Dr. Harsoor only saw Plaintiff one to two times a month for two months, suggesting a "lack of longitudinal treatment history"; she did not examine Plaintiff prior to his date last insured and her opinions "do not reflect the relevant time periods"; her restrictive residual functional capacity ("RFC") assessment is inconsistent with the medical records and appears to be "based solely on [Plaintiff's] subjective complaints"; and her treatment notes reflect that Plaintiff "is independent in all his activities of daily living."  (*Id.*).

With respect to Plaintiff's testimony, the ALJ found his complaints of disabling limitations to be "not . . . entirely consistent" and "not supported by the medical records."  (R. 28).   The ALJ noted that Plaintiff did not seek any treatment for more than three years after the alleged November 2004 disability onset date, and she described his treatment in 2008 and 2009 as "sporadic, routine and conservative" in nature.  (*Id.*).  The ALJ also emphasized that Plaintiff "was climbing ladders and changing light bulbs" during that period.  (R. 28-29).

Finding no record evidence of a severe impairment, the ALJ concluded that Plaintiff is not disabled within the meaning of the Social Security Act, and is not entitled to benefits. (R. 30).

## DISCUSSION

### A.     Standard of Review

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). In reviewing this decision, the Court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (citation omitted). Nor may it "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astru*e, 478 F.3d 836, 841 (7th Cir. 2007)). The court's task is to determine whether the ALJ's decision is supported by substantial evidence, which is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (quoting *Skinner,* 478 F.3d at 841).

In making this determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to [his] conclusion that the claimant is not disabled." *Simila v. Astru*e, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v.*

*Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

**B.      Five-Step Inquiry**

To recover DIB under Title II of the Social Security Act, a claimant must establish that he is disabled within the meaning of the Act.  *Crawford v. Astrue*, 633 F. Supp. 2d 618, 630 (N.D. Ill. 2009).  A person is disabled if he is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Crawford*, 633 F. Supp. 2d at 630; *Strocchia v. Astrue*, No. 08 C 2017, 2009 WL 2992549, at *14 (N.D. Ill. Sept. 16, 2009).  In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work?  *See* 20 C.F.R. § 404.1520; *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

**C.      Analysis**

Plaintiff claims that the ALJ's decision must be reversed because she (1) erred in finding that he does not have any severe impairments; (2) made a flawed credibility determination; (3) improperly characterized the consulting opinion

evidence; and (4) failed to consider the effects of his obesity in assessing the severity of his impairments.

### 1. Severe Impairment

Plaintiff first objects to the ALJ's step 2 finding that he does not suffer from a severe impairment.  An impairment is severe if it "significantly limits [one's] physical or mental ability to do basic work activities."  *Castile*, 617 F.3d at 926 (quoting 20 C.F.R. § 404.1520(c).  A determination that an impairment is not severe "requires a careful evaluation of the medical findings that describe the impairment(s) (i.e., the objective medical evidence and any impairment-related symptoms), and an informed judgment about the limitations and restrictions the impairment(s) and related symptom(s) impose on the individual's physical and mental ability to do basic work activities."  SSR 96-3p, 1996 WL 374181, at *2 (1996).  "The burden . . . is on the claimant to prove that the impairment is severe."  *Castile*, 617 F.3d at 926.

Plaintiff claims that the objective medical evidence in this case establishes that his back impairment is severe.  He notes, for example, that the January 2008 x-ray showed moderate degenerative changes at L5-S1 and prominent discogenic osteophytes at L3-L4, (R. 228), and that Dr. Neale diagnosed lumbar degenerative joint disease in February 2008, a condition Plaintiff insists "would have limited his ability to sit, stand, walk, and perform postural activities."  (Doc. 21, at 8).  Plaintiff also cites to the spondylosis and disc herniations revealed in his March 2011 MRI, (R. 262), and stresses that Dr. Harsoor limited him to

sitting, standing and walking for less than 2 hours in an 8-hour workday, with only rare twisting, crouching or climbing ladders and stairs.  (Doc. 21, at 9).

The problem for Plaintiff is that he has to establish that he was disabled on or before his December 31, 2009 date last insured.  *Allord v. Astrue*, 631 F.3d 411, 416 (7th Cir. 2011) (citing 42 U.S.C. § 423(a)(1)(A), (c)(1)).  As the ALJ noted, though Plaintiff alleges a disability onset date of November 2004, he did not seek any treatment until January 2008, more than three years later.  (R. 28).  He then saw Dr. Neale 6 times over the next two and a half years, but one of those visits had nothing to do with his back and another involved nothing more than medication refills.  (R. 216, 217).  Aside from prescribing Mobic (and subsequently Relafen in July 2010), Dr. Neale never suggested that Plaintiff receive any treatment whatsoever for his back despite the January 2008 x-ray findings.  Nor did Dr. Neale impose any restrictions on Plaintiff's activities, even after he came in complaining that he fell off a ladder while changing light bulbs.  As the ALJ fairly observed, Plaintiff's treatment in 2008 and 2009 was "minimal, routine and conservative."  (R. 27).  *See, e.g., McQueen v. Astrue*, No. 1:11-CV-01117-JMS-MJD, 2012 WL 3260230, at *4 (S.D. Ind. Aug. 8, 2012) (ALJ reasonably concluded the plaintiff's lumbar scoliosis was not a severe impairment where she sought no related treatment from 1999 through March 2005).

Plaintiff cannot avoid these minimal objective findings by pointing to medical evidence from 2011.  It is true that the March 2011 MRI revealed more extreme abnormalities, and Dr. Harsoor did limit Plaintiff to less than sedentary

work the following month. All of these findings, however, significantly post-date the December 31, 2009 date last insured. At best, there is evidence that Plaintiff's back had deteriorated as of 2011, but "the worsening of a claimant's condition after the date last insured is not a basis for granting benefits." *Pierce v. Astrue*, 907 F. Supp. 2d 941, 952 (N.D. Ill. 2012). *See also Eichstadt v. Astrue*, 534 F.3d 663, 666 (7th Cir. 2008) (ALJ properly concluded that medical and testimonial evidence post-dating the plaintiff's date last insured failed to support disability claim; "Although this evidence tended to suggest that [the plaintiff] is *currently* disabled, . . . it provided no support for the proposition that she was disabled at any time prior to" her DLI) (emphasis in original).

Plaintiff disagrees, arguing that Dr. Harsoor may have been commenting on his condition back in 2009. He notes that the April 2011 Chronic Pain Residual Functional Capacity Questionnaire "did not contain the dates as to when [Dr. Harsoor's] proposed restrictions applied," and says the ALJ should have recontacted her to clarify this point. (Doc. 31, at 3; Doc. 21, at 14). "An ALJ need recontact medical sources only when the evidence received is inadequate to determine whether the claimant is disabled." *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). Here, Dr. Harsoor made it clear that at the time she completed the Questionnaire, she had only seen Plaintiff once or twice a month for two months, amounting to a total of 3 or 4 exams. (R. 29, 249). Nothing in that document or the record as a whole remotely suggests that Dr. Harsoor had any knowledge of Plaintiff's condition more than a year earlier on December 31, 2009, much less that she was somehow opining that the stated

limitations extended back to that date. Indeed, such a finding would run counter to all of the available medical records from that period. The Court is satisfied that there is substantial evidence to support the ALJ's observation that "Dr. Harsoor's opinions do not reflect the relevant time periods, and are therefore not relevant for purposes of this claim." (R. 29).

In the absence of objective evidence that his back impairment was severe before the date last insured, Plaintiff is left with his own testimony that he cannot stand or walk for more than 30 to 45 minutes at a time; sit for more than 30 minutes at a time without walking and stretching his legs; carry a gallon of milk; cook meals; clean his house; or do more than wash a glass and spread a sheet over his bed. (Doc. 21, at 7-8). Yet Plaintiff does not cite a single case indicating that subjective testimony alone suffices to establish a severe impairment. To the contrary, it is undisputed that "the claimant bears the burden of supplying adequate records and evidence to prove their claim of disability." *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) (citing 20 C.F.R. § 404.1512(c)) ("You must provide medical evidence showing that you have an impairment and how severe it is during the time you say that you were disabled."). On the record presented, the ALJ reasonably concluded that Plaintiff did not meet his burden of establishing a severe impairment at step two of the analysis.

## 2.    Credibility Determination

Plaintiff next argues that the ALJ erred in finding his testimony not credible. In assessing a claimant's credibility, an ALJ must first determine whether the symptoms are supported by medical evidence. *See* SSR 96-7p, at

*2; *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007).  If not, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record."  *Arnold*, 473 F.3d at 822.  *See also* 20 C.F.R. § 404.1529; *Carradine v. Barnhart*, 360 F.3d 751, 775 (7th Cir. 2004).  Because hearing officers are in the best position to evaluate a witness's credibility, their assessment should be reversed only if "patently wrong."  *Castile*, 617 F.3d at 929; *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008).

For the reasons discussed in the previous section, there is ample support for the ALJ's determination that Plaintiff's complaints of disabling limitations as of December 31, 2009 were "not supported by the medical records."  (R. 28).  Looking to the other credibility factors, the ALJ found that Plaintiff's failure to seek any treatment from November 2004 to January 2008[2] and his "sporadic, routine and conservative treatment in 2008 and 2009[,] . . . suggests greater overall functioning ability."  (R. 28, 42-43).  Plaintiff objects that the ALJ "did not identify what kind of treatment would have been more aggressive or how frequently [he] would have sought treatment had his impairments been as severe as he alleged."  (Doc. 21, at 11).  Aside from taking Mobic, however, Plaintiff

---

[2]     Notably, Plaintiff testified that his pain was at a level of 8 or 9 out of 10 during that period, but he treated it with simple over-the-counter medications.  (R. 42-43).

received absolutely no additional treatment of any kind well into 2010. *Compare Baird v. Astrue*, No. 09 C 5764, 2011 WL 529045, at *1-2, 18 (N.D. Ill. Feb. 3, 2011) (ALJ erred in finding that the plaintiff had not received the expected types of treatment for bipolar disorder where he was "in consistent psychotherapy" for many years and was taking four different prescription medications). In the Court's view, relying on nothing more than a single medication to control pain easily qualifies as "conservative treatment." *Olsen v. Colvin*, __ Fed. Appx. __, 2014 WL 185378, at *6 (7th Cir. Jan. 17, 2014) (ALJ properly characterized epidural steroid injections as "conservative" treatment).

Plaintiff faults the ALJ for failing to discuss "the implications of [his] financial limitations," arguing that she should have "considered how an inability to pay for treatment may have influenced [his] decisions." (Doc. 21, at 12). The record does show that Plaintiff declined a fluoroscopic guidance in March 2011 because he could not afford it. (R. 260). As the ALJ noted, however, when she asked Plaintiff at the hearing why he decided not to pursue treatment prior to 2008, he responded that "he does not like doctors and thought that he would get better." (R. 28, 41, 47). These do not constitute "good reasons" for avoiding treatment. *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012) (citing SSR 96-7p, 1996 WL 374186, at *7, 8) ("good reasons" for not seeking medical treatment include "an inability to afford treatment, ineffectiveness of further treatment, or intolerable side effects."). Plaintiff speculates that he "may have been financially incapable of pursuing other treatment at other times," but this is wholly

insufficient to establish that the ALJ erred in discounting his credibility based on a lack of medical care. (Doc. 31, at 5).

In addition to the sporadic and conservative treatment, the ALJ also noted that Plaintiff's "extreme" allegations were inconsistent with the record. For example, Plaintiff testified that he "could only wash out a glass or spread out the sheet on the bed, and could only stand, walk and sit for thirty to forty five minutes," but "the evidence shows that he was climbing [a] ladder & changing light bulb[s], which suggests greater functioning ability." (R. 28). Plaintiff disputes that the act of changing light bulbs, which he describes as a "one-time occurrence that would have taken only minutes," demonstrates that he was exaggerating his pain symptoms. (Doc. 21, at 11). Perhaps, but the ALJ also observed that even in 2011, Dr. Harsoor repeatedly indicated that Plaintiff "is independent in all his activities of daily living" and exhibited "a normal gait, normal strength and sensations, and normal neurological exams." (R. 29, 255-56, 259-60, 263-64).

Plaintiff responds that the ALJ ignored evidence of the measures he took to mitigate or relieve his pain. This includes "cessation of physical leisure activities," "develop[ing] a dependence on his parents," "purchasing taller toilets," and "sometimes sleep[ing] in a reclining chair." (Doc. 21, at 10-11). It is true that the ALJ did not mention the taller toilets and recliner, but she did observe that Plaintiff "could not attend to his hobbies due to pain," and that his mother visited him three or four times a week "to assist him with daily chores, taking medications and helping him out of bed." (R. 28, 29). The ALJ further noted that

Plaintiff "could only stand, walk and sit for thirty to forty five minutes," "had trouble carrying a gallon of milk," "was unable to do too much cooking," and "has difficulty with concentration due to back pain." (R. 28). An ALJ "is not required to mention every piece of evidence" as long as she builds "an accurate and logical bridge between the evidence and the conclusion that the claimant is not disabled." *Craft*, 539 F.3d at 673 (internal quotations omitted). Here, the Court can trace the ALJ's reasons for discounting Plaintiff's credibility, and her finding in that regard is not patently wrong. *Elder*, 529 F.3d at 413-14; *Simila*, 573 F.3d at 517 (an ALJ's credibility determination is entitled to "deference, for an ALJ, not a reviewing court, is in the best position to evaluate credibility.").

### 3. Evaluation of Opinion Evidence

Plaintiff claims that the case must nonetheless be remanded because the ALJ mischaracterized the findings from Dr. Gotanco and Dr. Aquino. As the ALJ properly stated, both consulting physicians found "insufficient evidence to support arthritis of the lower lumbar spine prior to the date last insured." (R. 29). The ALJ gave these opinions "significant weight," explaining that they were "consistent with and supported by the record." (*Id.*). Plaintiff says the ALJ made an improper leap from "insufficient evidence" to "no severe impairment" because "opining that an impairment is decidedly not severe is not the same as opining that there was insufficient information to make a determination." (Doc. 21, at 14). The Court disagrees.

As noted earlier, "the claimant bears the burden of supplying adequate records and evidence to prove their claim of disability." *Scheck*, 357 F.3d at 702.

After reviewing the medical records from Dr. Neale, both Dr. Gotanco and Dr. Aquino concluded that Plaintiff had not met this burden. The ALJ discussed Dr. Neale's records, and even gave Plaintiff the benefit of the doubt that he suffered from a back impairment through his date last insured, but she also reasonably found that there was no evidence of it being severe during that period. (R. 28-30). On this record, there is no merit to Plaintiff's suggestion that the ALJ somehow rejected all of the medical evidence of record and then attempted to fill the alleged "evidentiary deficit" with her own lay opinion. (Doc. 21, at 14; Doc. 31, at 6) (citing *Suide v. Astrue*, 371 Fed. Appx. 684, 690 (7th Cir. 2010) (remand necessary where the ALJ's rejection of a physician's reports led to an "evidentiary deficit" and "[t]he rest of the record simply d[id] not support the parameters included in the ALJ's [RFC] determination.").

Also unavailing is Plaintiff's objection that Dr. Gotanco and Dr. Aquino lacked access to his complete medical file and never had a chance to review "additional evidence" of his condition as set forth by Dr. Harsoor. (Doc. 21, at 14; Doc. 31, at 5-6). For the reasons already stated, Dr. Harsoor's treatment notes from March 2011 have no bearing on Plaintiff's condition more than a year earlier in December 2009, and cannot support the existence of a severe impairment prior to the date last insured. Thus, the ALJ did not err in failing to "submit[] the additional evidence . . . to the state agency physicians for review." (Doc. 31, at 6).

In sum, the ALJ did not mischaracterize the state agency physician opinions in this case, and Plaintiff's request for remand on that basis is denied.

### 4.      Obesity

Plaintiff finally argues that the ALJ failed to properly analyze how his obesity impacts his back impairment.  The Seventh Circuit has made it clear that "[a]n ALJ must factor in obesity when determining the aggregate impact of an applicant's impairments."  *Arnett v. Astrue*, 676 F.3d 586, 593 (7th Cir. 2012).  As SSR 02-1p explains, "the combined effects of obesity with other impairments may be greater than might be expected without obesity.  For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone."  SSR 02-1p, 2000 WL 628049, at *6.  *See also Tolbert v. Astrue*, No. 10 C 7940, 2012 WL 1245611, at *10 (N.D. Ill. Apr. 13, 2012).

Here, though none of Plaintiff's medical records discussed obesity or BMI, the ALJ found the excess weight to be a medically determinable impairment that produces "some limitations" but "causes no more than minimal functional limitations on [Plaintiff's] physical or mental ability to perform work related activities."  (R. 27).  Plaintiff says this constitutes reversible error because the ALJ failed to "explain how she evaluated the effects that obesity had on [his] lumbar degenerative disc disease."  (Doc. 21, at 16).  However, Plaintiff said nothing about his weight during the administrative proceedings, and has failed to identify how obesity impacted his back condition prior to the December 31, 2009 date last insured.  *See Jones v. Colvin*, No. 11 C 1608, 2014 WL 185087, at *13 (N.D. Ill. Jan. 13, 2014) (citing *Hernandez v. Astrue*, 277 Fed. Appx. 617, 624 (7th Cir. 2008)) ("[I]t is the claimant's burden to articulate how his obesity

exacerbated his underlying conditions and further limited his functioning."). To the contrary, Plaintiff merely speculates that "the extra weight *may have* caused" additional strain on his back and increased pain. (Doc. 21, at 16).

As noted, Plaintiff sought no treatment for his back impairment for more than three years after the alleged disability onset date, and thereafter received only sporadic and conservative treatment from Dr. Neale into 2010. On this record, the ALJ reasonably concluded that Plaintiff's lumbar degenerative disc disease and obesity did not jointly produce more than minimal functional limitations prior to his date last insured, and do not rise to the level of a severe impairment. (R. 27).

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment is denied, and Defendant's Motion for Summary Judgment (Doc. 28) is granted. The Clerk is directed to enter judgment in favor of Defendant.

ENTER:

Dated: May 13, 2014

_____
SHEILA FINNEGAN
United States Magistrate Judge